```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
ABRAHAM (AVI) BASHER,

                            Plaintiff,          REPORT AND RECOMMENDATION
            v.
                                                 CV 01-5116 (DLI) (VVP)
MADONNA REALTY CORP. and
RACHEL BASHER,
                            Defendants.
---------------------------------------------------------------x
```
POHORELSKY, Magistrate Judge:

Judge Irizarry has referred to me for a Report and Recommendation, pursuant to 28 U.S.C § 636(b)(1), the defendants' Rule 12(b)(6) motion, for the sole purpose of determining, via a factual hearing, whether the plaintiff was "insane" within the meaning of N.Y. C.P.L.R. 208, during part or all of the period between July 1993 to December 30, 2003. A finding that the plaintiff suffers from a disability of "insanity" within the meaning of C.P.L.R. 208 would result in tolling the statute of limitations applicable to several claims here. For the reasons set forth below, the undersigned respectfully recommends that the plaintiff has failed to establish that he was insane within the meaning of C.P.L.R. 208 during the above period of time.

### I.     Legal Standard

Under C.P.L.R. 208, the limitations period for commencing an action may be tolled "[i]f a person entitled to commence an action is under a disability because of . . . insanity at the time the action accrues." N.Y. C.P.L.R. 208. The burden falls squarely on the plaintiff to establish his entitlement to tolling in such situations. *See Vallen v. S.H.T.A. Carrol*, No. 02 Civ. 5666, 2005 WL 2296620, at *3 (S.D.N.Y. 2005) (citations omitted); *Swartz v. Berkshire Life Ins. Co.*, No. 99 Civ. 9462, 2000 WL 1448627, at *5 (S.D.N.Y. 2000) ("The plaintiff has the burden of establishing insanity for purposes of the toll.") (citation omitted).

C.P.L.R. 208 is to be "narrowly interpreted." *McCarthy v. Volkswagen of Am., Inc.*, 55 N.Y.2d 543, 548 (1982). While the statute itself provides no definition of "insanity," the New York Court of Appeals has established that, at a bare minimum, those asserting C.P.L.R. 208 insanity as a basis for tolling must prove they "were unable to protect their legal rights because of an over-all inability to function in society." *McCarthy*, 55 N.Y.2d at 548. In doing so, the Court of Appeals examined the legislative history of C.P.L.R. 208, and determined that the Legislature had explicitly rejected the idea of substituting the phrase "mental illness" for "insanity," "because of the fear that this change might result in unwarranted extensions of the time within which to commence an action." *Id.* (citation omitted).

Since *McCarthy*, those seeking to toll limitation periods under C.P.L.R. 208 have had to overcome a high bar. *See, e.g.*, *Vallen*, 2005 WL 2296620, at *4-5 ("New York courts have consistently applied the *McCarthy* standard to claims of tolling by reason of insanity.") (citing *Eberhard v. Elmira City School Dist.*, 775 N.Y.S.2d 431, 433-34 (App. Div. 2004) (posttraumatic stress disorder not sufficient for tolling under C.P.L.R. 208)) (additional citation omitted); *Callahan v. The Image Bank*, 184 F. Supp. 2d at 362, 364 (S.D.N.Y. 2002) (collecting cases). As the court in *Swartz* observed, "[d]ifficulty in functioning is not sufficient to establish insanity for purposes of § 208; rather, the plaintiff must be totally unable to function as a result of a '*severe and incapacitating*' disability." 2000 WL 1448627, at *5 (quoting *Dumas v. The Agency for Child Development - New York City Head Start*, 569 F. Supp. 831, 833 (S.D.N.Y. 1983)) (emphasis added).

To qualify for tolling under C.P.L.R. 208, the plaintiff must also satisfy the "continuous disability" requirement, *Libertelli*, 565 F. Supp. at 236 (citation omitted), which requires a

showing that "the disability of insanity was continuous during the relevant period," *Carter v. Doe*, No. 05 Civ. 8432, 2006 WL 2109461, at *3 (S.D.N.Y. July 26, 2006) (citation omitted). Therefore, " 'if the plaintiff had a lucid interval of significant duration, preceded and followed by a period of insanity, the toll is lost and is not resurrected when a plaintiff relapses into insanity.' " *Carter*, 2006 WL 2109461, at *3 (quoting *Graboi v. Kibel*, 432 F. Supp. 572, 579 (S.D.N.Y. 1977)) (additional citation omitted); *von Bulow by Auersperg v. von Bulow*, 634 F. Supp. 1284, 1300 (S.D.N.Y. 1986) ("Any lucid interval or break in disability precludes tolling under CPLR § 208."). *See also Libertelli*, 565 F. Supp. at 237 (rejecting argument that *McCarthy* "substitute[d] the overall inability to function test for the continuity requirement," "particularly given the language of [C.P.L.R. 208].").

In determining whether the plaintiff is "insane" for tolling purposes, the court's "task is a pragmatic one, which necessarily involves consideration of all surrounding facts and circumstances relevant to the claimant's ability to safeguard his or her legal rights." *Cerami v. City of Rochester School District*, 82 N.Y.2d 809, 812 (1993) (citation omitted). The court's determination is "not necessarily based upon medical or psychological classifications." *Libertelli v. Hoffman-La Roche, Inc.*, 565 F. Supp. 234, 237 (S.D.N.Y. 1983) (quoting *Graboi*, 432 F. Supp. at 579) (internal quotations omitted). Nor is "the [c]ourt . . . required . . . to accept the conclusions of [the] plaintiff's expert, retained after the commencement of litigation." *Id.* (citation and internal quotation marks omitted). *Cf. Burgos v. City of New York*, 742 N.Y.S.2d 39, 40 (App. Div. 2002) (refusing to accept "vague and conclusory" doctor's affirmation "asserting that plaintiff's 'dementia and psychotic disorder [are] due to multiple medical

conditions [that] have existed for many years and are permanent,' " for purposes of tolling under C.P.L.R. 208).

**II.     Analysis**

To determine the insanity issue, the court held a two-day evidentiary hearing, at which the parties offered testimony and exhibits, followed by the submission of post-hearing briefs. The factual findings and conclusions below are based on the evidence adduced at the hearing and the other submissions of the parties in connection with this matter.

The plaintiff's claim of insanity arises from a tragic incident in July 1993, when the plaintiff was shot in the head during what appeared to be a botched robbery. After the shooting, the plaintiff lapsed into a coma, but subsequently regained consciousness. During the initial post-coma recovery period at Brookdale Hospital in Brooklyn, the plaintiff required substantial assistance with routine physical activities and was confined to a wheelchair. The plaintiff's condition eventually improved to the point where was transferred to various rehabilitation programs – first to Seaview Hospital, a city-run medical facility in Staten Island, and then to Transitions, a private outpatient program affiliated with Long Island Jewish Medical Center which specializes in treating head injury victims. The plaintiff commuted daily to Transitions from his Manhattan residence where he resided with Rachel, his ex-wife and a defendant in this action. After a falling out between the couple sometime around late 1994 or early 1995, the plaintiff traveled to Israel for a period of time and upon return to this country re-entered the Transitions program. He was eventually discharged from Transitions in July 1995.

After completing his medical treatment, the plaintiff led a nomadic life. Through the assistance of family and friends, the plaintiff was able to reside at various locales, some outside

New York, including Florida and Israel. While in Israel, the plaintiff also re-married, and fathered a son. This period of the plaintiff's life spanned several continents, placing him in Greece, Israel, and the Philippines.

At the hearing, the plaintiff, who bears the burden of proof on this issue, offered the testimony of two witnesses: Eli Basher, the plaintiff's brother, and Dr. Yehuda Nir, a psychologist who examined the plaintiff for purposes of this lawsuit.

Eli Basher's testimony focused primarily on the plaintiff's condition from 1993 – the year he was shot – to 1995 – the year his rehabilitation program ended. The thrust of Eli's testimony, and the plaintiff's post-hearing arguments as well, was aimed at portraying the plaintiff as a changed person not only with regard to the physical and mental manifestations of the gunshot injury but also in relation to the plaintiff's drastic shift in lifestyle from having once been "a star on Kings Highway" in Brooklyn before the shooting to an outcast of sorts afterwards. (Tr. 31:23, 142:20-24.) While that, unfortunately, may be the case, lifestyle changes are not taken into account when considering a claim of insanity under C.P.L.R. 208. Rather, tolling is only accorded to litigants who can establish an inability "to protect their legal rights because of an over-all inability to function in society." *McCarthy*, 55 N.Y.2d at 548. One's alteration of lifestyle, however drastic and unintended, does not speak to this.

Dr. Nir, who appeared genuinely passionate in his concern for the plaintiff's life, which he repeatedly described as "tragic,"[1] concluded that the plaintiff suffered from "[v]ery typical post-traumatic stress, plus damage to the brain." (Tr. 48.) *McCarthy* and subsequent cases have, however, consistently rejected "post traumatic neurosis" or similar psychological disorders as a

---

[1] Dr. Nir. used the word "tragic" a total of 22 times in his testimony.

sufficient basis for C.P.L.R. 208 tolling. *McCarthy*, 55 N.Y.2d at 548-49 ("The statute [C.P.L.R. 208], in our view, cannot be interpreted as providing a toll of the Statute of Limitations to an individual claiming a mere post traumatic neurosis."). S*ee also Reyes*, 2000 WL 1505983, at *6 (no C.P.L.R. 208 toll where plaintiff diagnosed with post-traumatic stress disorder as a result of separate gunshot and knife injuries); *Wenzel v. Nassau County Police Dep't*, CV-93-4888, 1995 WL 836054, at *2 (E.D.N.Y. Feb. 14, 1996) (Pohorelsky, Mag. J.) (no C.P.L.R. 208 tolling where plaintiff suffered from "bouts of depression, apathy, and anxiety."), *adopted by* 914 F. Supp. 902 (E.D.N.Y. 1996) (Spatt, J.). *But see Barnes v. County of Onondaga*, 65 N.Y.2d 664, 666 (1985) (C.P.L.R. 208 tolling allowed where medical testimony was uncontradicted and described the plaintiff as suffering from "a major depressive disorder" and "a very serious depressive reaction," which resulted in an overall inability to function in society).

From a factual perspective, there is no doubt that the plaintiff has suffered a great deal as a result of the gunshot injury, the effects of which still haunt his existence today. Legally, however, neither the testimony of Eli Basher or Dr. Nir, taken separately or in the aggregate, convinces the court that the plaintiff was "insane" from 1993 to 2003.[2] While the plaintiff did lapse into a coma after the shooting, thus rendering him unable to function in society, the law is clear that C.P.L.R. 208 tolling is proper only when the disability is the result of a mental rather than physical injury. *de los Santos v. Fingerson*, 97 Civ 3972, 1998 WL 740851, at *4

---

[2]Dr. Nir's testimony included significant inconsistencies which undercut his credibility. In particular, Dr. Nir's testimony that he had taken and saved notes after examining the plaintiff, as counsel for the defendants pointed out on cross-examination, contradicts a statement he made in an affidavit in which he stated he did not retain any such notes. (Tr. 81-82.) Dr. Nir eventually admitted that he had notes but did not produce them. (*Id.* at 82.) Dr. Nir also stated in the affidavit that he had "taken a medical and psychiatric history from Mr. Basher, as well as his family members." (Dr. Nir. Aff. ¶ 3, Defs.' Ex. E-1.) However, when confronted on cross-examination about this statement, Dr. Nir admitted that he "didn't interview [any of the plaintiff's] family members." (Tr. 80.)

(S.D.N.Y. Oct. 23, 1998) ("[L]ower courts have stressed that the over-all inability to function must be 'actually attributable to a mental, rather than a physical condition,' in order to serve as a predicate for tolling.") (citations omitted).

In any event, the plaintiff's medical records clearly establish that he was someone who did possess the capacity to function in society. For example, a "Psychosocial History" taken of the plaintiff on August 12, 1993, about two months after the shooting, describes his "mental status" as follows:

> Resident verbalizes and articulates his thoughts in appropriate expressions. His approach to his trauma could be characterized as stoic, almost matter of fact describing the circumstances which resulted in his injury in an almost impersonal manner. He appears to be primarily concerned with realization of his entitlements, particularly crime victims compensation, his return to family life, and work as soon as possible.

(Defs.' Ex. BB-1.)[3]

Once the plaintiff arrived at Transitions in December 1993, he was able to "interact[] with peers and staff" as well as "identify family and work problems and discuss[] them with staff." (Progress Report for May and June 1994, Psychosocial Findings, Defs.' Ex. KK at 24.) Doctors at the rehabilitation program also observed the plaintiff as "actively us[ing] the group to express his family and work difficulties," and "discussing his behavior (anger) with . . . group members . . . ." (Progress Report for July and August 1994, Psychosocial Findings, Defs.' Ex. KK at 29.) The report set a "long-term goal" for the plaintiff of "[r]eturn[ing] to home/work environment." (*Id.*)

---

[3] The plaintiff successfully secured compensation sometime in 1993 or 1994 from the Crime Victims Compensation program with the aid of his ex-wife, Rachel Basher. (Tr. 129:22-130:1, 411:14-412:17.)

Three months before his discharge in July 1995, a progress report rated the plaintiff as needing only "minimal assistance" (four points on a five point scale with five indicating "independent") for various "socialization/leisure skills," including "initiation of conversation," "appropriateness of behavior in social setting," "organization of unstructured time," and "participation in leisure/recreational activities." (Progress Report for March and April 1995, Defs.' Ex. BB-5.)[4] As for his "executive functions,"[5] the plaintiff is reported as needing "moderate assistance." (*Id.*) In explanatory comments following this assessment, the treating physician stated that "[t]his area has significantly improved during this reporting period," but noted that the plaintiff "still requires moderate to maximal assistance with follow through due to his inability to read or write." (*Id.*)

On July 25, 1995, the plaintiff was discharged from Transitions. The accompanying discharge summary stated, in part, that "Avi . . . made several gains in physical, occupational, speech/language, medical and cognitive domains over the last six months . . . ." (July 1995 Discharge Summary, Defs.' Ex. FF.) It also noted that the plaintiff has "[c]urrently . . . returned to independent living in an apartment in Manhattan." (*Id.*)

Non-medical evidence of other activities the plaintiff was engaged in during the relevant period further persuades this court that he was not insane. From 1993 to 2003, the plaintiff filed

---

[4]For each skill indicated above there are spaces in the report to indicate a particular "barrier to achieving [the specified] goal." Thus, for "initiation of conversation," the barrier was "decreased turn taking skills" and "decreased volume control." For "appropriateness of behavior in social setting," the barrier was "decreased temper control when frustrated." For "organization of unstructured time," the barrier was "difficulty in generating constructive activities." And, for participation in leisure/recreational activities," the barrier was "decreased participation in family events/outings." (*Id.*)

[5]"Executive functions," as detailed in the report, consist of skills involving "initiation," "planning," "organization," "flexibility," and "follow through." (*Id.*)

-8-

several lawsuits including a 1994 negligence state court action against the New York Police Department[6] and a 2001 action in this district, *Basher v. Bay Ridge Federal Credit Union*, No. 01-CV-7931 (NGG) (VVP), separate and apart from the present suit, which involved a mortgage for the property that is the subject of this dispute.[7]

Even if these lawsuits were filed with the assistance of others, as the plaintiff contends, they nonetheless demonstrate some ability on the part of the plaintiff to protect his legal rights. This court reached the same conclusion in *Wenzell*. The plaintiff there sought C.P.L.R. 208 tolling but was shown to have procured legal advice and instituted lawsuits during the relevant period. 1995 WL 836054, at *1-2. While the plaintiff in that case argued that "she was led in [those] [legal] actions almost entirely by [her fiancé] and . . . mother," this court nevertheless found tolling inappropriate because "the evidence [did] not establish that [she] was so disoriented and depressed that she was unaware of what she was doing." *Id.* at *3. *See also Carter*, 2006 WL 2109461, at *3 (finding that plaintiff's filing of "two lawsuits in the Southern District of New York during the three-year period following the incident at issue," demonstrated the plaintiff's "ability to advance his own legal interests."); *Vallen*, 2005 WL 2296620, at *4 (finding plaintiff not qualified for C.P.L.R. 280 toll, in part, because he filed five lawsuits during the relevant period); *Reyes*, 2000 WL 1505983, at *3 ("Although plaintiff's legal position on this motion is grounded on an assertion that he was unable to protect his legal rights during the years

---

[6] Rachel Basher was co-plaintiff for the 1994 suit.

[7] In 1994, the plaintiff also filed three petitions in the New York State Supreme Court for reassessment of taxes related to three different properties. (*See* Defs.'s Exs. T, U, & V.) While outside the relevant period, the court also notes that in 2004 the plaintiff filed a lawsuit in Israel seeking disability benefits. (Defs.' Exs. HH & GG; Tr. 306-07.)

1994-99, in fact he pursued several legal avenues, obtaining legal representation and displaying a consistent ability to advance his own legal interests in a variety of fora.").

Of equal significance, the plaintiff was able to testify in the 1994 case against the City while still admitted to various hospital recovery programs.[8]  His testimony in that case, as evidenced in transcripts provided to the court, was coherent and lucid, demonstrating a clear awareness of his environment and an ability to navigate its boundaries.  *See* Defs.' Exs. X & W. *Cf. Swartz*, 2000 WL 1448627, at *6 ("Indeed, Mr. Swartz's actions during the period in question indicate that he was able to function and manage his own affairs.  His letter of resignation . . . is lucid, and evidences an understanding of the procedures involved.").

The plaintiff also traveled extensively and independently during the relevant statutory period to wide-ranging locales including Israel, Florida, Jordan, Bahrain, Cyprus, and the Philippines.  (Tr. 154-65.)  Indeed, Eli, the plaintiff's brother, testified that anyone looking at the plaintiff's passport would "be amazed how many times he flew from Israel since the day he got shot."  (*Id.* at 138:16-18.)  Moreover, interspersed between his travels, the plaintiff lived abroad for extended periods, at times apparently in an individual capacity.  While in Florida, around 1997 to 1998, the plaintiff obtained a driver's license, and recently renewed his Florida-issued license plates through a New York-based service.  (*Id.* at 171:20-172:5, 230:7-235:20; Defs.' Exs. A-1, A-2, O.)  These facts further detract from the plaintiff's position that he had an overall inability to function in society during the relevant period.  *See Reyes*, 2000 WL 1505983, at *4 (citing plaintiff's "interest in and ability to travel during the time of his alleged insanity" as

---

[8]In connection with that case, the plaintiff testified in a 50-H hearing on April 12, 1994, and in an examination before trial on April 20, 1995.

an indication of his "general ability to function"); *Graboi*, 432 F. Supp. at 580 (concluding the plaintiff was not entitled to C.P.L.R. 208 tolling where during the relevant period she had "traveled extensively throughout Europe, booking passage, renting rooms, and obtaining passports and visas by herself.").

While much was made during the hearing about the plaintiff's unpredictability and poor judgment, this, in the court's view, is not equivalent to insanity as the term is understood here. Certainly, someone who acts imprudently and impulsively is also quite capable of managing his affairs and seeking redress for perceived wrongs.[9] Dr. Nir, himself, acknowledged on cross-examination that the plaintiff had the cognitive ability to recognize that he had been wronged and could take the appropriate steps to rectify that wrong. (*See* Tr. 71-72.) This is different from describing a person as consistently and thoroughly incapacitated, which is what the legislature had in mind when enacting C.P.L.R. 208. As the New York Court of Appeals made clear, "[by refusing] to broaden the scope of the CPLR insanity toll, we believe that the Legislature meant to extend the toll for insanity to only those individuals who are unable to protect their legal rights because of an over-all inability to function in society." *McCarthy*, 55

---

[9]Indeed, the plaintiff's situation is substantially similar to that of the plaintiff in *Graboi*, who unsuccessfully sought C.P.L.R. 208 tolling on the basis of insanity, which allegedly resulted from having been a rape victim. Judge Goettel, in a passage which this court finds particularly instructive, stated the following:

> The Court concludes, not without some reluctance that the picture of plaintiff's condition which emerged from the hearing was of a borderline schizophrenic state which tended to interfere with and shadow her behavior, but which only occasionally erupted in a true psychotic state, so that she was incapable of pursuing her lawful rights. At other times, plaintiff functioned well going to classes, graduating from college, traveling, and working.

432 F. Supp. at 580.

N.Y.2d at 548. As indicated above, this is an exacting standard which the plaintiff, who carries the burden of proof here, has failed to meet.

## CONCLUSION

For the reasons stated above, the court respectfully recommends that the plaintiff has failed to establish his "insanity" within the meaning of C.P.L.R. 208 during all or any part of the period from July 1993 to December 30, 2003.

\*    \*    \*    \*    \*    \*    \*

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court with a copy to the undersigned within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298 (2d Cir. 1992), *cert. denied*, 113 S. Ct. 825 (1992); *Small v. Secretary of Health and Human Serv.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

*Viktor V. Pohorelsky*
VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated: Brooklyn, New York
       November 29, 2006